CHARLES F. SANFORD v. VYNAL HARBAGE ET AL.

1. **Specific Performance not Barred by Existence of Mortgages against Land Involved.**

   The existence of mortgages on land involved in an action for specific performance does not bar relief, where willingness is shown on the part of the mortgagees to accept the amount of the indebtedness and cancel the mortgages.

2. **Petition in Specific Performance Averring Plaintiff's Readiness to Perform Sufficient without Tender.**

   A petition in an action for specific performance, which alleges that the plaintiff is ready and willing to perform and has offered so to do but has been met by refusal and repudiation of the contract by the defendant, is not open to demurrer on the ground that no sufficient tender is averred.

Madison County Circuit.

**3. Payment of Purchase Money Due on Complex Contracts for Purchase and Sale Sufficient for Specific Performance.**

> Under the contracts for the purchase and sale of land involved in the present case, the plaintiff is entitled to a decree of specific performance upon paying into court the amount of purchase money due.

APPEAL from common pleas court.

*Murray & Emery,* for plaintiff.

*Lincoln & McCloud,* for defendants.

**ALLREAD, J.**

This action is one for a specific performance and involves two complex and dependent contracts.

On May 1, 1909, William Wilson and wife by written contract sold outright a portion and gave an option for the remainder of his farm of 435.15 acres to Vynal Harbage, his heirs and assigns.

May 7 Harbage complied with the condition of the option and thereby became purchaser by contract of the entire farm.

Five hundred dollars was required to be and was paid in cash on May 1. The contract gave the purchaser the right to make advance payments to the amount of $7,000, but the contract was to be finally complied with on March 1, 1910, by the payment of the balance of the purchase money by Harbage and the conveyance by Wilson by warranty deed to Harbage "or to his heirs, executors or assigns." The contract expressly provided that all liens were to be canceled and the premises were to be free and clear.

On May 7, at the time the option was accepted, Harbage and Sanford entered into a written contract reciting the option and purchase of the Harbage-Wilson contract and stipulating for the purchase by Sanford of the easterly half of the 435.15 acres upon certain terms therein stated.

When the contracts were executed, there were three mortgages upon the real estate sold. Two were held by the Citizens Bank of South Charleston, both dated February 20, 1908, one calling for $17,000, due in five years, at 6 per cent interest payable annually, and with privilege of paying not exceeding one-

fifth of the principal on any interest payment day, and the other calling for $5,000, due also in five years, at 6 per cent interest payable annually, and with privilege of paying the entire principal on interest payment day in case the farm was sold within the preceding year.

The third mortgage was dated February 24, 1908, given to A. T. Cordray (and assigned to the Madison National Bank) to secure a note for $5,000 due in three years, with 6 per cent interest payable annually.

The $500 paid to Wilson on May 1 was credited on a $2,000 note secured by mortgage on real estate in Clark county.

While the Harbage-Sanford contract was being written Sanford paid to the Madison National Bank the Cordray note and mortgage of $5,000 and the balance of $1,500 of the note and mortgage on Clark county lands, and took assignments thereof.

The 435.15 acre farm was somewhat irregular in form and had a frontage near the southwest corner upon the National pike and also a frontage on the westerly side upon the Seaman country road.

The contract provided for the naming of a surveyor by agreement to survey the dividing line. Surveyor Asher was according to the evidence so designated, and made notes of what he considered a practical division of the farm. Sanford and also Asher made efforts to have a date fixed for the survey. Nothing was accomplished until on February 24, when Harbage called Asher by phone and fixed the following morning as the date for the survey. Sanford had previously made an arrangement to deliver stock at a distant point but upon notice requested Asher to attend and make the survey and stating that he, Sanford, would abide by the result. Asher and Harbage appeared at the time fixed. Harbage was unwilling to have Asher proceed in the absence of Sanford and Asher did not feel willing to do so. Harbage remained a short time and then left. Sanford came shortly after Harbage had gone, but nothing was done toward making the survey.

On February 28, the day before the contracts were to be performed and eight days after interest day, Wilson, in pur-

suance of an arrangement made by him and Harbage, went to the Citizens National Bank of South Charleston and gave a check upon the Madison National Bank of London for the amount of the $5,000 note and mortgage and for the sum of $3,400 of the principal of the $17,000 note and mortgage.

On March 10, Wilson and wife conveyed to Celeste Harbage (who is the wife of Vynal Harbage) sixty acres off the west side and to Vynal Harbage the balance of the farm at the price agreed upon in the contract of May 1. The only departure from the exact terms of the contract was the conveyance of the sixty acres to Celeste Harbage and the conveyance subject to the mortgages which were assumed by Harbage as part of the purchase money.

Sanford, on the date for final performance, had made arrangements for the funds necessary to comply with the contract and had further arranged with the Citizens Bank of South Charleston to send the notes and mortgages to London for payment and cancellation and was ready to surrender and cancel the note and mortgage held by him, and the offer to comply was communicated to Harbage who claimed to be willing but unable to comply because of the existing mortgages.

Many interesting questions are involved upon which we express briefly our views.

The evidence is not sufficiently clear and convincing to move a court of chancery to declare a resulting trust upon the first contract in favor of Sanford. Whatever interest and rights Sanford has are governed and controlled by the terms of the contract of May 7

Wilson was bound by the contract of May 1. He contracted thereby to convey to Harbage or "to his heirs, executors and assigns," but that clause did not bind Wilson to make conveyance of a part or all of this real estate to Sanford. The effect of the second contract was to create an equitable assignment *pro tanto.* Such partial assignment, however, based upon adjustment of consideration and other questions was not binding upon Wilson, except to call upon him after notice of Sanford's equity to comply fairly with his contract with Harbage.

Sanford v. Harbage.

It was stipulated in the Harbage-Sanford contract, "that if by reason of the failure of the title to said real estate or if for any other reason not within the control of said party of the first part (Harbage) that he should not receive said real estate from the said William Wilson as provided in his contract with him," then said Sanford to have no right of action for damages under the second contract.

It may, therefore be conceded that both under the law as well as by the express terms of the contract Harbage would be relieved from the Sanford contract, if performance of the first contract failed from want of title or any other cause without his fault. It is clear, in fact not disputed, that the conveyance to Celeste Harbage of the sixty acres off the west side does not of itself affect the question here.

We are of opinion that the survey provided for contemplated the fixing of a boundary line, from the contract. Sanford was diligent in trying to bring about the survey and is not chargeable with its failure. The line of division under the contract is a north and south line so drawn as to divide the farm equally and may yet be surveyed under order of the court.

Counsel for defendant contend that the existence of mortgages upon the premises, not due or capable of discharge at the date fixed for final performance, defeats the right of the vendee to relief. In the same connection it is urged and insisted upon that Wilson's conveyance to Harbage subject to the mortgages does not amount to a conveyance by Wilson "as provided in his contract," and that, therefore, the Harbage-Sanford contract can not be executed. The following cases are cited: *Lucas* v. *Scott*, 41 Ohio St. 636; *Peoples' Savings Bank Co.* v. *Parisette*, 68 Ohio St. 450 [67 N. E. Rep. 896; 96 Am. St. Rep. 672].

We think these cases are distinguishable in two vital respects:

(1)  The contract in each of the cases cited was defeated without fault or procurement of the vendor by a third party holding an inconsistent title.

Here the mortgagees were willing to release upon satisfaction of their claims. This is shown by the testimony of the mort-

gagees, who are disinterested and reputable, corroborated by the fact that they accepted $8,400 after interest day although not legally bound. Harbage arranged for Wilson to make this payment. There is no doubt from the evidence but that the whole of the debt would have been accepted if tendered. The default here was clearly that of Harbage and Wilson who had expressly contracted to give a clear title. There is no principle better settled and more universally recognized, both at law and in equity, than that a party should not be allowed to take advantage of his own wrong.

(2) The encumbrances here, unlike those in the cases cited, are capable of direct compensation in money.

There is no substantial difference between a vendee assuming a mortgage as part of the purchase money and his paying the purchase money in full and having the mortgage discharged therefrom.

This view finds support in 36 Cyc. 639. Among the cases cited in this authority is that of *Megibben* v. *Perin*, 7 O. F. D. 129 (49 Fed. Rep. 183), by Judge Sage, in which the following is laid down:

"A vendee can not avoid a specific performance of his contract because of a mortgage on the lands when it appears that an agreement has been made for the discharge thereof immediately upon the transfer, which discharge can be provided for in the decree."

There are cases from other states cited, and in some of these cases it appears that both parties knew of the existence of the mortgages at the time of the contract. The case of *Rife* v. *Lybarger*, 49 Ohio St. 422 [31 N. E. Rep. 768; 17 L. R. A. 403], and some other Ohio cases indicates the practice of courts of equity in providing in the decree against encumbrances. See also, Pomeroy, Specific Performance Sec. 342; *Grimshaw* v. *Hart*, 6 Rob. (La.) 265; *Rinaldo* v. *Hausman*, 52 How. Pr. (N. Y.) 190.

The existence of the mortgages upon the premises in view of the willingness of the mortgagees to receive the debt and cancel the mortgages does not bar relief.

It is urged that there was no mutuality in the contract of

May 7 as between Harbage and Sanford. The want of mutuality is based upon two propositions:

(1) That there is no express promise on the part of Sanford to pay the consideration.

We are of the opinion that Sanford's obligation to pay arises as a necessary inference.

(2) That Sanford was not bound to take the real estate subject to the mortgages.

It was, however, the duty of Wilson and Harbage, so far as they could, to remove the mortgages. The evidence shows clearly that they were in a position to do so. They could, therefore, have removed the mortgages and enforced the contract. Their failure to do so because they do not wish to do so, does not show a lack of mutuality in the contract.

It is insisted that no sufficient tender has been averred and proven to support the action. The leading cases of *Brock* v. *Hidy,* 13 Ohio St. 306, and *Wiedemann Brew. Co.* v. *Maxwell,* 78 Ohio St. 54 [84 N. E. Rep. 595], are decisive. The petition avers that Sanford was ready and willing to comply, and offered to do so, but was met by refusal and repudiation of the contract on the part of Harbage. This averment makes the petition good against demurrer.

The evidence shows clearly that on March 1 Sanford was ready and willing to perform and had offered to do so; that although not required by his contract to do so, Sanford had arranged for the payment and release of the mortgages and he made demand on Harbage for compliance on his part. We can not reconcile the evidence upon any other theory than that Harbage, in substance and effect, refused to perform and denied the validity of the contract.

Sanford, and his brother and Mr. Murray so testified, and Harbage himself admits, that he told Sanford that he could not comply on account of the mortgages on the land. Reducing this to a candid analysis, we are forced to the conclusion that no compliance was intended and that a further tender was thereby dispensed with.

Madison County Circuit.

The failure of Sanford to bring the tender into court does not bar relief in equity.

Sanford's rights attached as against Harbage as an equitable assignment *pro tanto* of the original contract and are superior to the dower rights of Mrs. Harbage. It is proper, therefore, to decree a removal of this cloud.

We are, therefore, of the opinion that plaintiff's right to a decree for a specific performance is clear, and it will be awarded upon plaintiff paying into the court the purchase money due under the contract. The plaintiff asks the court in case the description furnished in the petition is not accurate to require a competent surveyor to make the survey. This may be ordered in the decree and made returnable in ten days.

Decree accordingly.

**Dustin** and **Ferneding, JJ.,** concur.